## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

LUTHERAN CHURCH OF THE )
GOOD SHEPHERD, )
 )
       Plaintiff, )
 )
v. )     **Case No. 22-CV-223-CVE-SH**
 )
BROTHERHOOD MUTUAL INSURANCE )
COMPANY, )
 )
       Defendant. )

## <u>OPINION AND ORDER</u>

Now before the Court are Defendant Brotherhood Mutual Insurance Company's Motion for

Summary Judgment (Dkt. # 43) and Defendant Brotherhood Mutual Insurance Company's Omnibus

Motions in Limine (Dkt. # 45). Defendant Brotherhood Mutual Insurance Company (Brotherhood)

seeks summary judgment on plaintiff Lutheran Church of the Good Shepherd's (Good Shepherd)

claims of breach of contract and bad faith. Brotherhood also asks the Court to exclude certain

evidence if plaintiff is permitted to proceed to trial on any of its claims. Good Shepherd responds

that it is undisputed that the roof and interior of the church were damaged by a hail storm in April

2020, and Good Shepherd claims that Brotherhood has substantially undervalued the cost of repairs

covered by the insurance policy. Good Shepherd asserts that Brotherhood has breached the

insurance contract and acted in bad faith by conducting an inadequate and biased investigation.

### I.

Good Shepherd operates a church located at 8730 East Skelly Drive in Tulsa, Oklahoma, and

it purchased a commercial property insurance policy from Brotherhood. Dkt. # 43-1; Dkt. # 43-2,

at 3. The policy was in effect from January 1, 2019 to January 1, 2022. Dkt. # 43-2, at 3. The

policy covers "risks of direct physical loss unless the loss is limited or caused by a peril that is

excluded." Some of the exclusions include losses caused by contamination or deterioration, defects

or errors in workmanship, neglect, seepage of water, and wear and tear:

> c. **Contamination or Deterioration**: **We** do not cover loss caused by directly or indirectly by contamination or deterioration including corrosion, decay, fungus, mildew, mold, rot, rust or any quality, fault, or weakness in property that causes it to damage or destroy itself.  Such loss is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.  This exclusion does not apply to any resulting loss caused by a **specified peril** or breakage of building glass.

> •   •   •

> e. **Defects, Errors, and Omissions**:  **We** do not cover loss which results from one or more of the following:

>> 1) an act, error, or omission (negligent or not) relating to:

>>> a) land use;

>>> b) the design, specification, construction, workmanship, installation, or maintenance of property;

>>> c)  planning, zoning, development, siting, surveying, grading, or compaction; or

>>> d)  maintenance of property (including land, structures, or improvements);

>> whether on or off the described premises.

> •   •   •

> l. **Neglect**:  **We** do not cover loss caused by **your** neglect to use all reasonable means to save covered property at and after the time of loss.

>> **We** do not cover loss caused by your neglect to use all reasonable means to save and preserve covered property when endangered by a covered peril.

> •   •   •

2

n.  **Seepage**:  **We** do not cover loss caused by continuous or repeated seepages or leakage of water or steam that occurs over a period of 14 days or more.

•   •   •

s.  **Wear and Tear**:  **We** do not cover loss caused by wear and tear, marring, or scratching.  **We** cover any resulting loss caused by a specified peril or breakage or building glass.

Id. at 13-14.  The policy contains an exclusion for additional costs associated with complying with a law or ordinance, and the policy does not cover "loss or increased cost caused by enforcement of any code, ordinance, or law regulating the use, construction, or repair of any building or structure . . . ." Id. at 12.  In the Broadened Building and Personal Property Coverage Part, the policy excludes coverage for metal roofing:

16**.  Metal Roof and Metal Roof Top Accessories**:  **We** do not cover loss to metal roofing or metal roof top equipment or accessories, unless there has been:

a.  A decrease in functionality of the covered property;

b.  A decrease in the useful life of the covered property; or

c.  Dents, dings, or dimples to the covered property that can be seen without aid from either the ground on or near the insured premises or inside or from a balcony of the buildings supporting the covered property."

The term "direct physical loss" shall only mean a., b., or c., when covered property is metal roofing or metal roof top equipment or accessories.

Id. at 17.

In the event of a loss, the insured is required to "give [Brotherhood] or our agent prompt notice including a description of the property involved (we may request written notice)," and the insured must take "all reasonable steps" to avoid further harm to the covered property.  Id. at 18. The policy also requires the insured to send Brotherhood proof of the loss within 60 days, and the

3

proof of loss must include "detailed estimates for repair or replacement of covered property." Id. The insured is obligated to "cooperate in performing all acts required" by the policy." Id.

It is undisputed that the church building had needed roof repairs prior to the April 2020 storm, and Good Shepherd had a practice of making repairs to the roof with the assistance of members of the congregation. Dkt. # 43-4, at 3-4. Its youth coordinator, Tony Ozmun, had been going onto the roof with Pastor Bernardo Rangel for about four or five years to make repairs to the roof. Id. at 3. On April 22, 2020, a strong thunderstorm occurred in eastern Oklahoma and damaged homes and vehicles. Dkt. # 54, at 10. Ozmun testified in his deposition that leaks in the sanctuary of the church became "very noticeable" after the April 2020 storm. Dkt. # 43-3, at 3. Ozmon recalled roof leaks prior to the storm, but he did not remember that any leaks had occurred in the sanctuary of the church. Id. Good Shepherd's congregation initially attempted to make repairs to the roof, but it became apparent that the damage to the roof was more severe than they could repair without professional assistance. Id. at 5. A roofing company visited the church and offered to conduct a free roof inspection, and Good Shepherd allowed the roofing company, RestoreMasters, to conduct an inspection using a drone. Dkt. # 43-4, at 8. In January 2021, RestoreMasters prepared a report containing numerous photographs of the roof, and RestoreMasters put Good Shepherd in contact with Raven Consulting, a public insurance adjusting firm. Id. at 7. The congregation held a meeting and voted to file an insurance claim, because the damage was "more than we could handle and more than we could afford." Dkt. # 43-3, at 5.

On February 15, 2021, Raven Consulting gave notice to Brotherhood that Good Shepherd would be pursuing a claim for hail and wind damage caused by the April 22, 2020 storm. Dkt. # 43-6. The initial loss notice states that the church sustained damage to the metal roof, which caused

4

interior water leaks, and Good Shepherd reported that there was visible hail damage on the roof.  Id.
The roof of the church consists of a steeple, upper and lower levels of thermoplastic polyolefin
(TPO) roofing, and standing seam metal panels.  Dkt. # 43-8.  Brotherhood sent a field adjustor,
David Palmer, to initially assess possible hail damage to the church building and the surrounding
property.  Palmer noted that there were many small leaks inside the building, and visible water stains
suggested that many of the interior leaks appeared to be old.  Dkt. # 43-7, at 2.  Palmer inspected the
roof and found no hail-related damage to the TPO roofing material.  Id.  However, a large steeple
structure on the roof had significant hail dents that could be seen from the ground.  Id.  Palmer
described any hail damage to the metal roofing as "cosmetic," and he could not observe this damage
from the ground due to the slope of the roof.  Id.

Brotherhood sent Raven Consulting a letter requesting a signed proof of loss within 60 days
providing the following information:

- the time, place and circumstances of the loss;
- other policies of insurance that may cover the loss;
- the interest of you and all others in the property, including all mortgages and liens;
- changes in title or occupancy of the covered property during the policy period;
- detailed estimates for repair or replacement of covered property;
- available plans and specifications of buildings and structures;
- detailed estimates of any covered loss of income and expenses;
- an inventory of damages personal property, including description, quantity, replacement price, and any other information that helps verify the values claimed.

Dkt. # 43-9, at 2.  Brotherhood advised Good Shepherd that it was proceeding under a reservation
of rights, and Brotherhood stated that "[i]nitial indications" suggested that exclusions for metal
roofing, deterioration, defects, errors, and omissions, and seepage may apply to Good Shepherd's

property damage claim.  Id.  Raven Consulting requested an extension of time to submit a written proof of loss to Brotherhood, because Brotherhood had scheduled an engineering inspection that had not yet taken place.  Dkt. # 43-11, at 3.  Raven Consulting wanted additional time to review the engineer's report before submitting a proof of loss on behalf of Good Shepherd.  Id.  Brotherhood claimed that it could not extend the deadline for the insured to submit its proof of loss, because this would "change the language of the policy."  Id. at 6.  However, Brotherhood agreed that it was obligated to consider all information submitted by the insured, even if the information was provided outside the 60 day deadline imposed by the policy.  Id.

Brotherhood requested an engineering report of Michael D. Pruitt, P.E., concerning Good Shepherd's claim for hail damage, and a representative of Raven Consulting, Rachel Binns, was present during his inspection to point out areas of concern.  Dkt. # 43-10.  Pruitt described the building as a "single story, steel-framed structure constructed over a slab-on-grade," and the roof "is covered with standing-seam metal panels and single-ply thermoplastic membrane."  Id. at 3.  Binns told Pruitt that the storm giving rise to Good Shepherd's hail damage claim occurred on April 22, 2020, and Binns opined that the roof coverings of the building were damaged by hail.  Id. at 4.  Pruitt observed three-quarter inch dents on the air conditioner condenser fins and up to one inch dents on the rooftop vent caps.  Id.  Pruitt saw circular indentations on the TPO roofing located sporadically across the roof, but he determined that the roof membrane was not fractured and there were no "clean spots" near the dents.  Id.  Pruitt also observed dents on the metal roofing, but he did not see any fractured roof panels or seams open near the dents.  Id. The report provides background about the type of damage that is normally associated with hail impacts, but the damage to the TPO roofing was more consistent with foot traffic and tool marks, rather than hail impacts.  Id. at 7.  Pruitt determined

that the metal roofing had sustained hail damage, but the dents were not clean and likely occurred before the April 22, 2020 hail storm.  Id. There were also no dents near the seams of the metal roofing panels, and Pruitt believed that any damage to the metal roof was cosmetic and not the cause of water leaks inside the building.  Id.  Palmer reviewed Pruitt's engineering report and issued a final report finding that the church had sustained $12,806.40 in losses resulting from the April 22, 2020 hail storm.  Dkt. # 43-13, at 2.  This amount was reduced to $10,714.66 for the actual cash value (ACV) of the damage and, minus a $5,000 deductible, resulted in a payment of $5,714.66 to Good Shepherd.

After Palmer issued his final report, Raven Consulting provided Brotherhood a proof of loss claiming that Good Shepherd was owed $646,663.37 to fully compensate it for the loss incurred to the building as a result of the hail storm, and Good Shepherd was also seeking $732.79 for damage to a wooden fence.  Dkt. # 43-14.  The proof of loss was submitted to Brotherhood on June 8, 2021, or 24 days after the 60 day deadline to submit a proof of loss imposed by the policy.  Dkt. # 43, at 12; Dkt. # 54, at 7.  The document prepared by Raven Consulting lists all damage to the property, without including any analysis or evidence to show that the damage was caused by the April 22, 2020 storm.  Dkt. # 43-14.  On June 28, 2021, Brotherhood sent Binns a letter explaining the breakdown of the loss estimate and proposed payment, and the adjuster, Angela Cox, stated that she was relying on the engineering report, the field adjuster's report, and the proof of loss provided by Raven Consulting.  Dkt. # 43-16, at 4.  Cox cited the metal roof exclusion and relied on Pruitt's findings that any hail damage did not impair the functionality of the roof.  Id.  However, hail damage to the metal panels on the steeple was visible from the ground, and damage to these panels was covered under the policy.  Id. Cox also found that hail damage to lettering on a church sign and the

7

air conditioning fins were covered.  Id.  Cox noted there that were interior water leaks, but deterioration, poor workmanship, or design defects existing for an extended period time were responsible for these leaks.  Id. at 4-5.  Cox cited the deterioration, defects, errors, or omissions, neglect, and seepage exclusions in support of Brotherhoods' decision to deny coverage for interior water leaks.  Id. at 5.

Raven Consulting sent Brotherhood an estimate of $6,598 to repair the letters on the wall-mounted church sign, as well as an invoice for $89 for an inspection of the HVAC system for storm damage.  Dkt. # 43-17.  The HVAC report noted "slight" hail damage to coils, but the HVAC units were primarily in "bad shape" due to rust and improper wiring.  Id. at 4. Brotherhood sent an e-mail in response to the estimates provided by Raven Consulting, and Brotherhood agreed to pay an additional $89 for the HVAC inspection.  Dkt. # 43-18, at 2.  However, the estimate for repair of the sign provided by Raven Consulting sought funds for more than the two damaged letters, and Brotherhood initially refused to adjust the amount of the loss for additional repairs to the sign.  Id.  Brotherhood subsequently agreed to pay for all of the letters on the sign after Good Shepherd's contractor confirmed that it could not get matching letters and all of the letters would have to be replaced.  Brotherhood issued a supplemental payment of $4,987.94 to Good Shepherd.  Dkt. # 43-19, at 2; Dkt. # 43-21, at 2.

On March 2, 2022, Raven Consulting asked Brotherhood to toll the "suit against us" provision of the policy to allow Good Shepherd to "finalize the claim in a timely manner and without escalation."  Dkt. # 43-22.  Brotherhood responded that it had not received any correspondence from Raven Consulting or Good Shepherd in approximately six months, but Brotherhood would consider any new evidence or information provided by Good Shepherd in support of its claim.  Dkt. # 43-24.

Brotherhood stated that it would consider a request to toll the "suit against us" provision if Good Shepherd provided a timeline for the submission of new evidence, but it declined to extend the deadline to file a lawsuit merely to allow Raven Consulting additional time to "finalize" Good Shepherd's insurance claim.  Id.  Binns responded to Brotherhood that Raven Consulting was waiting for an engineering report in order to get a work permit for the approved steeple repair, and it would open a competitive bidding process after it received the report.  Dkt. # 43-25.

In April 2022, Raven Consulting received an engineering report from Valor Forensic Engineering Services (Valor), and the report states that Valor was retained to determine whether the repairs authorized by Brotherhood were feasible and to comment on the engineering report prepared by Pruitt.  Dkt. # 43-26, at 3.  Valor conducted site evaluations on September 20, 2021 and March 4, 2022.  Id. at 6.  Valor observed dents on the metal roof panels on the north side of the building, and Valor claimed that it could observe "dents from the ground under certain lighting conditions." Id. at 7.  Valor's inspector, Chad Williams, acknowledged that some of the photographs showing hail damage were taken using a cellular phone and were enhanced using the zoom function of the phone, but Williams testified that he could see dents on the metal roof "when there was glare against the metal."  Dkt. # 54-2, at 29.  Valor disassembled a portion of the metal roof panels near the steeple and found that the single-ply TPO membrane had "been run up and under the copper flashing at the base of the steeple."  Id.  The top edge of the membrane had not been properly secured and the membrane "remain[ed] loose and separate from the underlying roof layers."  Id.  Valor took issue with Pruitt's use of the term "cosmetic" hail damage, and Valor suggested that the insurance policy did not distinguish between "cosmetic" and "functional" hail damage.  Id. at 8.  Valor determined that it would be necessary to remove and replace the TPO membrane in order to replace the metal

roof panels near the steeple.  Id. at 9.  Williams explained that it was not within Valor's scope of work to determine whether the church was damaged by the April 2020 hail storm in particular, and he understood that the cause of the loss was not in dispute.  Dkt. # 54-2, at 11, 34.

In response to the Valor report, Brotherhood retained Haag Engineering (Haag) to inspect the roof of the building to "determine the potential of hail damage affecting the insulating value of the roof system" and whether replacement of the metal roof near the steeple would also require replacement of the TPO membrane.  Dkt. # 43-27, at 3.  Representatives of Good Shepherd were present during Haag's inspection and they assisted with the extraction of a roof substrate sample. Id. at 4.  Haag expected to find a layer of insulation beneath the TPO membrane as required by then-current building codes but, instead, found a thin wood fiber board underneath the membrane.  Id. at 5.  Haag presumed that the board was placed over an older section of roofing material that was underlaid with insulation, but it would likely cause water to leak into the interior of the building if Haag had removed the older roofing material.  Id.  The board was also unlikely to have any insulating properties and it was not installed for the purpose of insulation, and the actual insulation was protected by the TPO membrane, the cover board, and the older roof membrane.  Id.  Haag found that replacement of the metal siding on the steeple did not require the replacement of the TPO membrane.  Id. at 5-6.

Good Shepherd retained an expert to provide a cost estimate to repair the damage caused by the April 2020 hail storm.  The expert, David Poynor, stated that he conducted an investigation of the property and he relied on Valor's report, and Poynor found that the damage to church property was consistent with a hail event.  Dkt. # 43-28, at 3.  Poyner states that he interviewed representatives of Good Shepherd to assess the building's pre-loss and post-loss condition, and

Poynor ruled out the age of the roof or maintenance-related issues as causes of the damage he observed.  Id.  Poyner explained in his deposition that he did not conduct an independent causation analysis, and adopted Valor's findings that Good Shepherd's property was damaged by the April 2020 hail storm.  Dkt. # 54-1, at 19.  Poyner used a computer program known as Xactimate to prepare an estimate of the cost of repairs, and he estimated that the total cost of repairs to church property was $581,652.55, reduced to $539,405.33 to account for depreciation.  Dkt. # 43-28, at 25.

On April 20, 2022, the Good Shepherd filed a petition in Tulsa County District Court alleging claims of breach of contract and bad faith against Brotherhood.  Brotherhood removed the case to this Court on the basis of diversity jurisdiction.  Brotherhood has filed a motion for summary judgment as to both of Good Shepherd's claims, and the motion is ripe for adjudication.

## II.

Summary judgment pursuant to Fed. R. Civ. P. 56 is appropriate where there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); Kendall v. Watkins, 998 F.2d 848, 850 (10th Cir. 1993).  The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  Celotex, 477 U.S. at 317.  "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'"  Id. at 327.

11

"When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (citations omitted). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the [trier of fact] could reasonably find for the plaintiff." Anderson, 477 U.S. at 252. In essence, the inquiry for the Court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 250. In its review, the Court construes the record in the light most favorable to the party opposing summary judgment. Garratt v. Walker, 164 F.3d 1249, 1251 (10th Cir. 1998).

### III.

Brotherhood argues that plaintiff has failed to meet its burden to show that Brotherhood has not paid the full amount of the covered loss under the insurance policy, and plaintiff is asking Brotherhood to pay for damage that is clearly and unambiguously excluded by the policy. Dkt. # 43, at 21-24. Brotherhood also asserts that plaintiff delayed in making an insurance claim and failed to cooperate with Brotherhood during its investigation, and Brotherhood seeks summary judgment on plaintiff's breach of contract and bad faith claims. Id. at 18-20. Plaintiff responds that it is undisputed that the roof of the church and other property was damaged by a hail storm, and there is a genuine dispute as to whether Brotherhood has paid the full amount owed under the insurance policy. Dkt. # 54, at 16-20. Plaintiff also argues that Brotherhood has acted in bad faith by failing

12

to conduct an adequate investigation and by proposing a repair to the steeple that is "potentially dangerous" and fails to comply with current building codes. Id. at 22-39.

### A.

Brotherhood argues that plaintiff cannot show that Brotherhood breached the insurance contract, because plaintiff failed to meet its burden to show that a covered loss occurred. Brotherhood also argues that plaintiff is seeking damages that are expressly excluded by the insurance policy. Plaintiff responds that Brotherhood is precluded from taking the position that a covered loss did not occur on April 22, 2020, and there is a genuine dispute as to whether damage to the metal roof can be seen from the ground. Plaintiff also argues that the repair to the steeple authorized by Brotherhood is inadequate and would result in a roof that does not comply with building codes.

This is a diversity case requiring the Court to construe disputed terms of an insurance policy as required by state law. See Zurich American Ins. Co. v. O'Hara Reg'l Ctr. for Rehabilitation, 529 F.3d 916, 920 (10th Cir. 2008); Houston General Ins. Co. v. American Fence Co., Inc., 115 F.3d 805, 806 (10th Cir. 1997). Under Oklahoma law, an insurance contract should be construed according to the terms set out within the four corners of the document. First American Kickapoo Operations, L.L.C. v. Multimedia Games, Inc., 412 F.3d 1166, 1173 (10th Cir. 2005); Redcorn v. State Farm Fire & Cas. Co., 55 P.3d 1017, 1020 (Okla. 2002); London v. Farmers Ins. Co., Inc., 63 P.3d 552, 554 (Okla. Civ. App. 2002). If the terms of the contract are "unambiguous, clear and consistent, they are to be accepted in their ordinary sense and enforced to carry out the expressed intention of the parties." Roads West, Inc. v. Austin, 91 P.3d 81, 88 (Okla. Civ. App. 2004). A court should not create an ambiguity in the policy by "using a forced or strained construction, by taking a provision

13

out of context, or by narrowly focusing on a provision." Wynn v. Avemco Ins. Co., 963 P.2d 572, 575 (Okla. 1998).  A policy term will be considered ambiguous only if it susceptible to more than one reasonable interpretation. Max True Plastering Co. v. U.S. Fidelity & Guar. Co., 912 P.2d 861, 869 (Okla. 1996).  If an insurance contract contains an ambiguous term, the Court may refer to extrinsic evidence to interpret the insurance policy.  Gable, Simmons & Co. v. Kerr-McGee Corp., 175 F.3d 762, 767 (10th Cir. 1999) (citing Pierce Couch Hendrickson Baysinger & Green v. Freede, 936 P.2d 906, 912 (Okla. 1997)).

Oklahoma courts apply the doctrine of reasonable expectations in construing ambiguous or technical language in an insurance policy.  See Haworth v. Jantzen, 172 P.3d 193, 196 (Okla. 2006) ("In construing an ambiguity or uncertainty against the insurer and in favor of the insured, Oklahoma looks to the objectively reasonable expectations of the insured to fashion a remedy.").  The doctrine of reasonable expectations is an interpretative tool used to discern the intent of the parties "when the policy language is ambiguous or when an exclusion is 'masked by technical or obscure language' or 'hidden in a policy's provisions.'" American Economy Ins. Co. v. Bogdahn, 89 P.3d 1051, 1054 (Okla. 2004) (quoting Max True Plastering Co, 912 P.2d at 870).  Whether policy language is ambiguous is a question of law for the court to decide, and the "test for ambiguity is whether the language 'is susceptible to two interpretations on its face . . . from the standpoint of a reasonably prudent lay person, not from that of a lawyer.'" Edens v. The Netherlands Ins. Co., 834 F.3d 1116, 1121 (10th Cir. 2016) (quoting Cranfill v. Aetna Life Ins. Co., 49 P.3d 703, 706 (Okla. 2002)).  However, courts must not "indulge in forced or constrained interpretations to create and then to construe ambiguities in insurance contracts." Broom v. Wilson Paving & Excavating, Inc., 356 P.3d 617, 628 (Okla. 2015).

14

Plaintiff argues that it is undisputed that the church and surrounding property was damaged during the April 22, 2020 hail storm, and Brotherhood is prohibited from asserting that plaintiff has failed to prove that all of the damages plaintiff now seeks are attributable to the storm. Dkt. # 54, at 17. This assertion misrepresents the actual argument asserted by Brotherhood. Brotherhood has acknowledged that a hail storm occurred on April 22, 2020 and that some of the harm for which plaintiff seeks to recover is attributable to the hail storm. Dkt. # 43, at 12; Dkt. # 61, at 13. Brotherhood has reasonably disputed whether all of the damage to the church building was caused by the April 22, 2020 storm, as there is evidence that the roof of the building was leaking before the storm occurred. The evidence is undisputed that church members repaired the building, including the roof, prior to the storm, and Brotherhood is actually arguing that roof was in need of repair or replacement before April 22, 2020. Dkt. # 61, at 16. Brotherhood argues that plaintiff must show that the total roof replacement sought as a remedy in this case is necessary because of the April 22, 2020 storm, and defendant is correct that plaintiff has the initial burden to establish a covered loss. Cherokee Nation v. Lexington Ins. Co., 521 P.3d 1261, 1266 (Okla. 2022); Pitman v. Blue Cross and Blue Shield of Oklahoma, 217 F.3d 1291, 1298 (10th Cir. 2000). In this case, Brotherhood does not dispute that a covered loss occurred on April 22, 2020, but it argues that it has fully compensated plaintiff for the loss attributable to the storm. The Court will consider whether the damages plaintiff seeks can be linked to the April 22, 2020 storm, but there is no dispute that the date of the loss was April 22, 2020 or that Brotherhood has acknowledged that a covered loss occurred on that date.

The parties dispute whether the metal roofing exclusion in the policy is applicable to plaintiff's insurance claim. Dkt. # 54, at 22-25. The metal roofing exclusion states as follows:

>    16**. Metal Roof and Metal Roof Top Accessories**:  **We** do not cover loss to metal
>    roofing or metal roof top equipment or accessories, unless there has been:
>
>    a.  A decrease in functionality of the covered property;
>
>    b.  A decrease in the useful life of the covered property; or
>
>    c.  Dents, dings, or dimples to the covered property that can be seen without aid from
>    either the ground on or near the insured premises or inside or from a balcony of the
>    buildings supporting the covered property."
>
>    The term "direct physical loss" shall only mean a., b., or c., when covered property
>    is metal roofing or metal roof top equipment or accessories.

Dkt. # 43-2, at 17.  The parties are primarily focused on whether damage to the metal roof panels can

be seen from the ground without aid.  There is no dispute that metal roof panels on or near the

steeple sustained hail damage that is visible from the ground, but there is conflicting evidence

concerning the visibility of hail damage to other parts of the roof.  Palmer could not observe hail

damage to parts of the roof from the ground, but his initial report also suggests that the slope of the

roof may impair the visibility of the roof from the ground.  Dkt. # 43-7, at 2.  Valor's inspector,

Williams, took photographs of the roof depicting hail damage on the roof using a zoom function on

his camera, but this would appear to violate the language of the policy that the "dents, dings, or

dimples . . . can be seen without aid."  Dkt. # 43-2, at 17.  Williams also stated that he could observe

"dents from the ground under certain lighting conditions," but this raises a question of fact as to

whether the dents are visible within the meaning of the policy language.  Plaintiff has also presented

evidence that a church member, Justin Brock, claims that he could see dents or dings on the metal

roofing from the ground without aid.  Dkt. # 54-13, at 2.  However, there is clearly a factual dispute

as to the visibility of dents or dings on the metal roof panels from the ground without aid, and

plaintiff may be able to prove that the metal roof exclusion does not apply to its claim.  It will

ultimately be Brotherhood's burden to prove that this exclusion is applicable to plaintiff's claim, and

the applicability of the metal roofing exclusion is a genuine issue of material fact that precludes

summary judgment on plaintiff's breach of contract claim.

Plaintiff also argues that Brotherhood's estimate for the repair of the steeple is inadequate,

because it will be necessary to remove and replace the TPO membrane in order to replace the metal

roof panels on the steeple. Dkt. # 54, at 26. Plaintiff claims that Brotherhood must be required to

pay for a repair that complies with applicable building codes and does not pose a risk of harm to

members of the church. Id. at 26-30. The policy contains a provision concerning coverage for

additional costs incurred as a result of compliance with a building code or ordinance:

> We cover indirect loss from application of an enforceable ordinance, law, or code
> regulating the use, demolition, construction or repair of the building(s) listed on the
> declarations as a result of direct damage to or destruction of such building(s) by a
> covered peril, as indicated below. The ordinance, law, or code must be in force at the
> time of the loss. No coverage will be provided in relation to the application of an
> ordinance, law, or code if you were required to comply with ordinance, law, or code
> but failed to do so.

Dkt. # 61-4, at 2. The Court finds that there is a genuine dispute as to the feasibility of the repair and

whether Brotherhood would be required to pay for additional repairs to ensure compliance with

building codes. Plaintiff claims that the roof was in "satisfactory condition" prior to the hail storm,

but there is conflicting evidence in the summary judgment record concerning the adequacy of repairs

performed by church members, the condition of the roof, and issues related to workmanship or

installation of the roof itself. The policy expressly does not require Brotherhood to pay additional

amounts to bring the roof up to code if the roof was not in compliance with building codes prior to

the April 22, 2020 hail storm, and Haag's inspection revealed that the roof was not installed in

compliance with then-current building codes. Dkt. # 43-27, at 3. Even if the Court were to assume

17

that the repair authorized by Brotherhood would not comply with building codes, plaintiff must first establish that the roof had been installed in compliance with or brought into compliance with building codes prior to the hail storm.  If plaintiff can show that the roof was installed in compliance with then-applicable building codes, plaintiff may be entitled to damages for additional repairs beyond the amount authorized by Brotherhood for repair of the steeple, and the cost and feasibility of repairs to the steeple is also a genuine dispute of material fact that precludes summary judgment on plaintiff's breach of contract claim.

Viewing the evidence in a light most favorable to plaintiff, the Court finds that there are genuine disputes as to material facts precluding summary judgment on plaintiff's breach of contract claim.  The Court cannot determine from the summary judgment record the condition of the roof prior to the storm, the amount of plaintiff's damages that can be attributed to the storm, and the applicability of the metal roofing exclusion, and these issues must be resolved by a jury. Brotherhood's motion for summary judgment is denied as to plaintiff's breach of contract claim.

**B.**

Brotherhood argues that it conducted a reasonable investigation into plaintiff's insurance claim and promptly issued a payment for what it believed would fully compensate plaintiff for its covered loss, and plaintiff has no evidence suggesting that Brotherhood can be held liable for bad faith handling of plaintiff's insurance claim.  Dkt. # 43, at 25-28.  Plaintiff responds that Brotherhood can be held liable for bad faith, even if there is a legitimate coverage dispute, because there is conflicting evidence concerning the adequacy of Brotherhood's investigation and a reasonable jury could find that Brotherhood acted in bad faith by underpaying plaintiff's insurance claim.  Dkt. # 54, at 36-39.

The Oklahoma Supreme Court has held that "an insurer has an implied duty to deal fairly and act in good faith with its insured and that the violation of this duty gives rise to an action in tort for which consequential and, in a proper case, punitive, damages may be sought."  Christian v. Am. Home. Assurance Co., 577 P.2d 899, 904 (Okla. 1977).  "The core of a bad-faith claim 'is the insurer's unreasonable, bad-faith conduct, including the unjustified withholding of payment due under a policy.'"  Flores v. Monumental Life Ins. Co., 620 F.3d 1248, 1255 (10th Cir. 2010) (quoting McCorkle v. Great Atl. Ins. Co., 637 P.2d 583, 587 (Okla. 1981)).  To succeed on a bad faith claim, plaintiffs "must present evidence from which a reasonable jury could conclude that the insurer did not have a reasonable good faith belief for withholding payment of [plaintiffs'] claim."  Oulds v. Principal Mut. Life Ins. Co., 6 F.3d 1431, 1436 (10th Cir. 1993); accord Shotts v. GEICO Gen. Ins. Co., 943 F.3d 1304, 1314 (10th Cir. 2019).  According to the Tenth Circuit, courts generally use a two-step analysis to determine whether a plaintiff has made a sufficient showing of bad faith.  Shotts, 943 F.3d at 1314-15.  The Court considers 1) "whether there is a legitimate dispute between the insurer and the insured regarding coverage or the value of the claim"; and 2) "if the court determines there is a legitimate dispute between the parties, . . . whether the plaintiff offered specific additional evidence to demonstrate bad faith."  Id. at 1315.  "The additional evidence required for this showing" may include evidence that 1) "the insurer did not *actually* rely on th[e] legitimate [dispute] to deny coverage"; 2) the insurer "denied the claim for an illegitimate reason"; 3) the insurer "otherwise failed to treat the insured fairly"; and 4) "the insured performed an inadequate investigation of the claim."  Id. (internal quotations and citations omitted) (emphasis and alterations in Shotts, 943 F.3d at 1315).

19

There is no dispute that Brotherhood promptly conducted an investigation upon receiving notice of plaintiff's insurance claim, and Brotherhood's investigator, Palmer, found evidence suggesting that water had been leaking into the building for a substantial period of time. Dkt. # 43-7, at 2. Church members confirmed that they had been making repairs to the roof for several years prior to the April 2020 hail storm, and they filed an insurance claim when the scope of repairs was greater than what they felt could repair without professional assistance. Dkt. # 43-3, at 5. Palmer observed hail damage to the metal roof panels on the steeple that could be seen from the ground, but he found no hail damage to the TPO roofing material on other parts of the roof. Id. Brotherhood received an engineering report from Pruitt, and Pruitt observed some evidence of hail strikes on the roof of the building, particularly near the steeple of the church. However, Pruitt determined that the hail damage to the metal roof was primarily cosmetic in nature and was not the cause of interior water leaks. Dkt. # 43-10, at 7. Raven Consulting provided a proof of loss to Brotherhood stating that it would take $646,663.37 to fully repair church property for damage incurred as a result of the hails storm, although the proof of loss is essentially an invoice listing the cost of repairs with no analysis or evidence concerning the causation of Good Shepherd's loss. Dkt. # 43-14. Raven Consulting received an engineering report from Valor as to the feasibility of the repair authorized by Brotherhood, but Valor's inspector, Williams, did not believe that it was within the scope of his work to determine whether the April 22, 2020 hail storm was the cause on any damage to the roof. Dkt. # 54-2, at 11, 34. Good Shepherd retained another expert, Poynor, to assess the cost of repair to church property, but Poynor did not conduct any independent causation analysis as part of his work. Dkt. # 54-1, at 19. Instead, Poynor relied on Valor's report to support his understanding that

all damage to church property was caused by the April 22, 2020 hail storm, and Poynor estimated that it would take $581,652.55, minus an amount for depreciation, to fully repair church property.

Plaintiff argues that Brotherhood could not have had a good faith basis to deny coverage for the full amount identified in the proof of loss, because Brotherhood failed to adequately investigate whether the metal roofing exclusion applied and Brotherhood should have known that the proposed repair would not comply with local building codes. Dkt. # 54, at 38-39. However, the Court has already established that there is a genuine dispute as to both of these issues, and the Court finds that both of these issues also show that there was a legitimate coverage dispute as to the amount owed to plaintiff on its insurance claim. There is disputed evidence concerning the visibility of damage to the metal roof from the ground and, if a jury were to resolve this issue if favor of Brotherhood, this would substantially limit the coverage available to plaintiff under the policy. The policy also expressly provides that Brotherhood is not required to pay additional costs for repairs to bring plaintiff's roof into compliance with current building codes if plaintiff was required to comply with such codes prior to the April 22, 2020 storm and failed to do so. Dkt. # 61-4, at 2. The mere fact that plaintiff is demanding damages substantially beyond the amount paid by Brotherhood does not detract from the legitimacy of the coverage disputes identified by Brotherhood.

The existence of a legitimate coverage dispute does not automatically foreclose liability for bad faith, and the Court will consider additional relevant factors identified by the Tenth Circuit in Shotts that could show that Brotherhood acted in bad faith by intentionally paying an unreasonably low amount to resolve plaintiff's insurance claim. The evidence establishes that the coverage issues raised by Brotherhood were not a sham or raised merely for the purpose of disputing coverage, and there is significant likelihood that one or more exclusions under the policy will apply to certain

21

aspects of plaintiff's insurance claim.  In other words, Brotherhood actually relied on the legitimate disputes to partially deny coverage on plaintiff's claim and the denial was not for an illegitimate reason.  There is also no evidence that Brotherhood treated plaintiff unfairly or failed to perform an adequate investigation.  Brotherhood promptly sent a field adjustor, Palmer, to investigate plaintiff's claim, and Brotherhood received an engineering report from Pruitt.  Although plaintiff disagrees with Palmer's and Pruitt's opinions, there is no evidence in the summary judgment record suggesting that they were biased or acted with an improper motive in reaching their opinions about the cause of damage or the amount of damage to the church.  At most, the evidence establishes that there is a disagreement between the parties as to the amount owed to plaintiff on its claim for hail and wind damage, but plaintiff has failed to produce any evidence suggesting that Brotherhood lacked a good faith belief that it had paid plaintiff the full amount owed on its claim.  There is no genuine dispute of fact as to plaintiff's bad faith claim, and Brotherhood is entitled to summary judgment on this claim.

## C.

Brotherhood has filed a motion in limine (Dkt. # 45) asking the Court to exclude certain evidence at trial, but it appears that the evidentiary issues raised by Brotherhood are not substantially disputed.  Of the 15 issues raised by Brotherhood, plaintiff disputes the admissibility of three categories of evidence identified in the motion in limine.  Dkt. # 45; Dkt. # 51.  The three matters in dispute between the parties appear to relate solely to plaintiff's bad faith claim, and the Court has determined that the bad faith claim will not be submitted to the jury.  There is no reason for the Court to consider evidentiary disputes as to plaintiff's bad faith claim, and the Court finds that the motion

in limine (Dkt. # 45) is moot.  If the parties believe there are disputed evidentiary issues pertaining to plaintiff's breach of contract claim, the parties may raise those issues at the pretrial conference.

    **IT IS THEREFORE ORDERED** that Defendant Brotherhood Mutual Insurance Company's Motion for Summary Judgment (Dkt. # 43) is **granted in part** and **denied in part**: the motion is granted as to plaintiff's bad faith claim and denied as to plaintiff's breach of contract claim.

    **IT IS FURTHER ORDERED** that Defendant Brotherhood Mutual Insurance Company's Omnibus Motions in Limine (Dkt. # 45) is **moot**.

    **IT IS FURTHER ORDERED** that due to a modification to this district's jury trial schedule, the jury trial currently set for **February 20, 2024** is **stricken**, as is the pretrial conference currently set for **January 31, 2024**.

    **IT IS FURTHER ORDERED** that the pretrial conference is **reset** for **February 13, 2024 at 10:00 a.m.** and the jury trial is **reset** for **March 4, 2024 at 9:15 a.m.**  The deadlines for requested jury instructions and voir dire, and for exchange of demonstrative exhibits, are extended to **February 26, 2024**.

    **DATED** this 25th day of January, 2024.

CLAIRE V. EAGAN
UNITED STATES DISTRICT JUDGE